Nos. 12-2157, 12-2257, 12-2262
_____

## UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT
_____

KEVIN B. MCCARTHY, ALBERT H. LANGSENKAMP, AND BVM FOUNDATION, INC.,
Plaintiffs – Counter-Defendants – Appellants

v.

PATRICIA ANN FULLER A/K/A SISTER JOSEPH THERESE AND PAUL M. HARTMAN,
Defendants – Counter-Claimants – Appellees

v.

LANGSENKAMP FAMILY APOSTOLATE AND THE SIGMA MICRO CORPORATION,
Counter-Defendants – Appellants
_____

On Appeal from the United States District Court
for the Southern District of Indiana
Indianapolis Division
Case No. 1:08-cv-00994-WTL-DML
The Honorable William T. Lawrence, Jr.

_____

## APPELLANTS' RESPONSE TO
## THE AMICUS BRIEF OF THE HOLY SEE
_____

Michael A. Swift
MAGINOT MOORE & BECK, LLP
111 Monument Circle, Suite 3250
Indianapolis, IN 46204
Tel: (317) 638-2922
maswift@maginot.com

Bradley M. Stohry
REICHEL IP LLP
212 West 10th Street, Suite D-280
Indianapolis, IN 46202
(317) 423-8820
brad@reichelip.com

William S. Consovoy*
J. Michael Connolly
WILEY REIN LLP
1776 K Street NW
Washington D.C. 20006
Tel:  (202) 719-7460
Fax: (202) 719-7049
WConsovoy@wileyrein.com

February 8, 2013                          * *Counsel of Record for Appellants*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.     THE HOLY SEE'S BRIEF CONFIRMS THIS COURT'S JURISDICTION OVER APPELLANTS' APPEALS UNDER THE COLLATERAL ORDER DOCTRINE. ............................................................................................................. 2

II.    THE HOLY SEE'S BRIEF SUBSTANTIALLY SUPPORTS APPELLANTS' ARGUMENTS AND SHOULD BE FULLY DISCUSSED THROUGH MERITS BRIEFING. ............................................................................................................. 12

CONCLUSION .................................................................................................................. 15

CERTIFICATE OF SERVICE ......................................................................................... 17

i

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Alicea-Hernandez v. Catholic Bishop*,
  320 F.3d 698 (7th Cir. 2003) ....................................................................5

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................2, 3, 12

*Askew v. Trustees of General Assembly of Church of the Lord Jesus Christ*,
  684 F.3d 413 (3d Cir. 2012).................................................................13

*Behrens v. Pelletier*,
  516 U.S. 299 (1996)................................................................................3

*Cannata v. Catholic Diocese*,
  700 F.3d 169 (5th Cir. 2012) ..............................................................13

*Cohen v. Beneficial Industrial Loan Corp.*,
  337 U.S. 541 (1949).................................................................................3

*Digital Equipment Corp. v. Desktop Direct, Inc.*,
  511 U.S. 863 (1994)............................................................................3, 11

*EEOC v. Catholic University of America*,
  83 F.3d 455 (D.C. Cir. 1996) ...............................................................10

*Fayerweather v. Ritch*,
  195 U.S. 276 (1904)................................................................................9

*Giddings v. Vision House Production, Inc.*,
  584 F. Supp. 2d 1222 (D. Ariz. 2008) ................................................15

*Helstoski v. Meanor*,
  442 U.S. 500 (1979).................................................................................4

*Hosanna-Tabor Evangelical Lutheran Church & School v. EEOC*,
  132 S. Ct. 694 (2012)....................................................................5, 9, 13

*Hottenroth v. Village of Slinger*,
  388 F.3d 1015 (7th Cir. 2004) .............................................................15

*Iceland Steamship Co., Ltd.-Eimskip v. United States Department of Army*,
  201 F.3d 451 (D.C. Cir. 2000) ..............................................................8

*Kedroff v. Saint Nicholas Cathedral of Russian Orthodox*
   *Church of North America*,
   344 U.S. 94 (1952) .................................................................6

*Klagsbrun v. Va'ad Harabonim of Greater Monsey*,
   53 F. Supp. 2d 732 (D.N.J. 1999) .........................................14

*Lumpkin v. Envirodyne Industries, Inc.*,
   933 F.2d 449 (7th Cir. 1991) ................................................11

*Mitchell v. Forsyth*,
   472 U.S. 511 (1985).....................................................3, 4, 9, 10

*Mitchell v. Helms*,
   530 U.S. 793 (2000)...............................................................2, 5, 6

*Mohawk Industries, Inc. v. Carpenter*,
   130 S. Ct. 599 (2009)...........................................................3, 11

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
   460 U.S. 1 (1983)..................................................................11

*Moñtano v. City of Chicago*,
   375 F.3d 593 (7th Cir. 2004) .................................................1

*Nixon v. Fitzgerald*,
   457 U.S. 731 (1982)...............................................................4

*NLRB v. Catholic Bishop*,
   440 U.S. 490 (1979)...............................................................2, 9

*O'Bryan v. Holy See*,
   556 F.3d 361(6th Cir. 2009) ..................................................8

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*,
   506 U.S. 139 (1993)..............................................................4, 6, 9

*Rayburn v. General Conference of Seventh-Day Adventists*,
   772 F.2d 1164 (4th Cir. 1985) ...............................................9

*Serbian Eastern Orthodox v. Milivojevich*,
   426 U.S. 696 (1976)..............................................................5, 11

*Tomic v. Catholic Diocese*,
   442 F.3d 1036 (7th Cir. 2006) ...............................................9

*United States v. Blagojevich*,
   612 F.3d 558 (7th Cir. 2010) .................................................4

*United States v. Iribe*,
564 F.3d 1155 (9th Cir. 2009) ........................................................8

*United States v. Kashamu*,
656 F.3d 679 (7th Cir. 2011) ........................................................12

*United States v. Morgan*,
313 U.S. 409 (1941) ........................................................................9

*United States v. P.H.E., Inc.*,
965 F.2d 848 (10th Cir. 1992) ........................................................4

*Watson v. Jones*,
80 U.S. 679 (1871) ..........................................................................5

*Will v. Hallock*,
546 U.S. 345 (2006) ........................................................................3

*Young v. Northern Illinois Conference of United Methodist Church*,
21 F.3d 184 (7th Cir. 1994) ............................................................5

**STATE CASES**

*Dayner v. Archdiocese of Hartford*,
23 A.3d 1192 (Conn. 2011) ............................................................9

*DeBruin v. St. Patrick Congregation, Baltimore Annual Conference*,
816 N.W.2d 878 (Wis. 2012) ........................................................15

*Erdman v. Chapel Hill Presbyterian Church*,
286 P.3d 357 (Wash. 2012) ..........................................................15

*United Methodist Church v. White*,
571 A.2d 790 (D.C. 1990) ........................................................9, 11

**FEDERAL STATUTES**

28 U.S.C. § 1291 ................................................................................2

28 U.S.C. § 1292 ................................................................................1

**RULES**

Fed. R. Evid. 201 ............................................................................13

Fed. R. Evid. 902 ............................................................................13

## <u>INTRODUCTION</u>

In their related appeals, Kevin McCarthy, *et al*. ("Appellants") seek immediate review of two district court decisions. First, Appellants challenge the court's refusal to accept through judicial notice the Catholic Church's determination of Patricia Ann Fuller's religious status within that hierarchical institution. *See* App. No. 12-2257. Second, Appellants challenge the court's refusal to stay the proceedings pending the Church's resolution of the ecclesiastical property issues and the subsequent and related denial of summary judgment. *See* App. No. 12-2157. Because the district court has yet to enter final judgment, the Court requested briefing on its appellate jurisdiction. As explained, the Court has jurisdiction under: (1) the collateral order doctrine; (2) 28 U.S.C. § 1292(a)(1) as the district court's orders have the effect of denying an injunction; and (3) the doctrine of pendant jurisdiction. *See* Doc. 3 at 13-24, App. No. 12-2157.[1]

The Court also requested, and has now received, the views of the Holy See as to whether "the resolution of the specific claims or defenses raised in this civil dispute between the parties require a determination of Roman Catholic religious doctrine." Doc. 16 at 3, App. No. 12-2157. The key import of the Holy See's brief at this stage of the proceedings is to confirm this Court's jurisdiction under the collateral order doctrine. Appellants' appeals—at their core—involve a challenge to a civil court's authority under the Religion Clauses of the First Amendment to resolve theological issues. The Holy See's brief confirms that such issues fall within the ambit of the collateral order doctrine as they are "too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949). A civil court

---

[1]     Patricia Ann Fuller, *et al*. ("Appellees") have also filed an appeal. *See* App. No. 12-2262. As previously explained, this Court lacks jurisdiction over this appeal. *See* Doc. 15-1 at 3-9, App. No. 12-2262. Nothing in the Holy See's brief alters this conclusion.

commits "unnecessary [and] offensive" harms by "trolling through a person's or institution's religious beliefs," *Mitchell v. Helms*, 530 U.S. 793, 828 (2000), and it imposes severe process harms through the burdens of civil litigation as "the very process of inquiry leading to findings and conclusions" may "impinge on rights guaranteed by the Religion Clauses," *NLRB v. Catholic Bishop*, 440 U.S. 490, 502 (1979). These harms are irreparable and cannot be corrected through appellate review after a trial has been held.

The Holy See's brief also confirms that these precise harms will occur in this case absent immediate review. Without immediate correction, Church authorities will be haled into court to defend their religious views and a civil jury will resolve, among other things: (1) whether Patricia Ann Fuller is a nun notwithstanding the Catholic Church's official determination to the contrary; and (2) the scope of a nun's vow of poverty and its bearing on a series of property disputes between the parties. A civil court's plenary resolution of these questions will "raise the specter of inconsistent findings between civil and ecclesiastical authorities [and] create a significant danger of confusion among the faithful." Holy See Br. 32-33, No. 12-2157 (Doc. 38).

Finally, while the Holy See's brief devotes substantial attention to the proper resolution of the underlying claims, the issue at this stage is whether these appeals involve a category of issues for which immediate appellate review is available—not whether Appellants ultimately will prevail once the Court reaches the merits. *See Ashcroft v. Iqbal*, 556 U.S. 662, 672 (2009). The Court should find appellate jurisdiction and order merits briefing.

## **ARGUMENT**

## I.     **THE HOLY SEE'S BRIEF CONFIRMS THIS COURT'S JURISDICTION OVER APPELLANTS' APPEALS UNDER THE COLLATERAL ORDER DOCTRINE.**

Under 28 U.S.C. § 1291, this Court has jurisdiction over appeals from all "final decisions" of the district courts of the United States. Though the statute's finality requirement

ensures that interlocutory appeals "are the exception, not the rule, it does not prevent review of all prejudgment orders." *Iqbal*, 556 U.S. at 671 (citations omitted). Under the collateral order doctrine, "a limited set of district-court orders are reviewable though short of final judgment." *Id*. (citations omitted). The judicial orders within this category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (quoting *Cohen*, 337 U.S. at 546).

A primary characteristic of an appealable decision under the collateral order doctrine is that "unless it can be reviewed before the proceedings terminate, it can never be reviewed at all." *Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985). In determining whether an order is "effectively unreviewable on appeal," the decisive factor is whether delaying review "would imperil a substantial public interest" or "some particular value of a high order." *Will v. Hallock*, 546 U.S. 345, 352-53 (2006). This inquiry requires "a judgment about the value of the interests that would be lost through rigorous application of a final judgment requirement." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 878-79 (1994). In making this judgment, courts do not perform an "individualized jurisdictional inquiry" but instead "focus[] on the entire category to which a claim belongs." *Mohawk Indus., Inc. v. Carpenter*, 130 S. Ct. 599, 605 (2009).

The Supreme Court's application of this doctrine to qualified immunity illustrates the point.  In a series of decisions, the Court has held that a district court's rejection of that defense can fall within the collateral order doctrine, *Forsyth*, 472 U.S. at 530, because qualified immunity "is both a defense to liability and a limited 'entitlement not to stand trial or face the other burdens of litigation,'" *Iqbal*, 556 U.S. at 672 (quoting *Forsyth*, 472 U.S. at 526). The

collateral order doctrine provides essential protection because "absent immediate appeal, the central benefits of qualified immunity—avoiding the costs and general consequences of subjecting public officials to the risks of discovery and trial—would be forfeited." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 143-44 (1993).

The Supreme Court has extended this same rationale to other areas as well. In *Puerto Rico Aqueduct*, the Court applied the collateral order doctrine to denials of Eleventh Amendment immunity. Because the Eleventh Amendment effectively confers immunity from suit, "the value to the States of their Eleventh Amendment immunity, like the benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motion practice." *Id*. at 145. "The very object and purpose of the 11th Amendment were to prevent *the indignity* of subjecting a State to the coercive process of judicial tribunals at the instance of private parties." *Id*. at 146 (emphasis added). As the Court explained, the collateral order doctrine's "ultimate justification is the importance of ensuring that the States' dignitary interests can be fully vindicated." *Id*.

At base, the Supreme Court's cases favorably applying the collateral order doctrine share two important characteristics. First, the appeal implicated an important constitutional or common-law right. *See Nixon v. Fitzgerald*, 457 U.S. 731, 741-43 (1982) (absolute Presidential immunity); *Forsyth*, 472 U.S. at 525-30 (qualified immunity); *Puerto Rico Aqueduct*, 506 U.S. 139 (Eleventh Amendment immunity); *see United States v. Blagojevich*, 612 F.3d 558, 560 (7th Cir. 2010) (common law right of access to public records). Second, the substantive "right at stake included the right to be free from the adverse effect of undergoing the trial itself." *United States v. P.H.E., Inc.*, 965 F.2d 848, 854 (10th Cir. 1992); *see, e.g., Abney v. United* States, 431 U.S.

651 (1977) (Fifth Amendment right against double jeopardy); *Helstoski v. Meanor*, 442 U.S. 500 (1979) (the Constitution's Speech or Debate clause's protection against judicial questioning).

The category of First Amendment religious rights at issue here implicates both concerns. First, the Supreme Court has long held that the Religion Clauses of the First Amendment protect fundamental rights against church-state entanglement, which includes preventing civil courts from evaluating or interpreting issues of religious doctrine. *See Watson v. Jones*, 80 U.S. 679, 733-34 (1871) (noting the "evils" that would occur if civil courts inquired into "the doctrinal theology" of religious denominations); *Serbian E. Orthodox v. Milivojevich*, 426 U.S. 696, 709 (1976) (forbidding "extensive inquiry by civil courts into religious law and polity"); *Helms*, 530 U.S. at 828 ("It is well established … that courts should refrain from trolling through a person's or institution's religious beliefs."); Holy See Br. 27-30 ("The prohibition against a civil court's determination or interpretation of religious doctrine is universally recognized in First Amendment jurisprudence.").

Indeed, the very act of a civil court or jury inquiring into religious views "is not only unnecessary but also offensive." *Helms*, 530 U.S. at 828; *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 132 S. Ct. 694, 715 (2012) (Alito, J. and Kagan, J., concurring) ("[T]he mere adjudication of [certain religious issues] would pose grave problems for religious autonomy: It would require calling witnesses to testify about the importance and priority of the religious doctrine in question, with a civil factfinder sitting in ultimate judgment of what the accused church really believes, and how important that belief is to the church's overall mission."). Civil court review of ecclesiastical decisions thus "are *in themselves* an extensive inquiry into religious law and practice, and hence forbidden by the First Amendment." *Young v. N. Ill. Conference of United Methodist Church*, 21 F.3d 184, 187 (7th Cir. 1994) (emphasis in

original); *see Alicea-Hernandez v. Catholic Bishop*, 320 F.3d 698, 703 (7th Cir. 2003) ("[A]n investigation and review of such matters of church administration and government … could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment.").

In other words, just as the collateral order doctrine protects States' "dignitary interests," *Puerto Rico Aqueduct*, 506 U.S. at 146, it similarly protects the dignity the Constitution affords to religious institutions. The First Amendment carves out a "spirit of freedom for religious organizations, an independence from secular control or manipulation—in short, power to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. Saint Nicholas Cathedral*, 344 U.S. 94, 116 (1952). A crucial purpose of the First Amendment is "to prevent the indignity of subjecting a [church] to the coercive process of judicial tribunals at the instance of private parties." *Puerto Rico Aqueduct*, 506 U.S. at 146. Thus, while applying the collateral order doctrine here is "justified in part by a concern that [churches] not be unduly burdened by litigation, its ultimate justification is the importance of ensuring that the [church's] dignitary interests can be fully vindicated." *Id*. Preventing harm to these rights trumps the values of abstaining until final judgment. Once a civil court has "troll[ed] through a person's or institution's religious beliefs," *Helms*, 530 U.S. at 828, the damage is done and it cannot be repaired after final judgment.

The untenable path the district court plans to follow demonstrates the problem. The court does not intend to accept the Church's determination of Fuller's status. The court rejected a declaration from Archbishop Secretary Joseph W. Tobin, C.Ss.R., on behalf of the Holy See's Congregation for Institutes of Consecrated Life, which recognized that Fuller was dismissed from her religious order in 1982 and therefore "is not a member of any religious institute

formally recognized by the Catholic Church." Doc. 317, ID 6822; *see* Holy See Br. 9-10. And it—incredibly—rejected as inconclusive a Nota Verbale from the Holy See's Apostolic Nunciature in Washington, D.C., which affirmed the authenticity of Archbishop Tobin's declaration and requested that "the United States of America and its courts accord full faith and credit to the Declaration." Doc. 317, ID 6823. In short, the decision "was made 30 years ago, and has been recognized as valid by various Catholic Church authorities numerous times since." Holy See Br. 31. Yet the district court refuses to accept this determination.

Instead, the district court has ruled that Fuller's status is a triable issue and the jury will decide whether she is—or is not—a Catholic nun. And to decide Fuller's religious status, the jury will determine whose view of canon law is correct: the Church's or Fuller's. *Compare id*. 31 (Church's reasons for dismissing Fuller), *with id*. 34-35 (Fuller's counter-arguments under canon law). If Fuller prevails, "she will be able to use the civil judgment to argue that she is, in fact, a Sister in the Catholic Church. Such a result would raise the specter of inconsistent findings between civil and ecclesiastical authorities, and would create a significant danger of confusion among the faithful." *Id*. 32-33. "By reaching a determination directly contrary to the long-standing decision of the Church regarding Fuller's status, the ruling would interfere with the Church's control over internal governance and discipline in precisely the manner that the First Amendment prohibits." *Id*. 33.

Similarly, the district court asserted its authority to interpret the vow of poverty, which bears directly on the property disputes. It determined that a vow of poverty does not "have the effect of automatically transferring any property [a nun] acquires" to the Church. Doc. 119, ID 2135. Instead, the vow "require[s] an action by [the nun]—she ha[s] to 'hand over' the property. Simply because one takes a vow does not mean that one complies with all of the requirements of

7

that vow." *Id.*, ID 2135-36. In other words, the district court essentially held that the vow of poverty allows a nun to pick and choose which items in her possession belong to the Church. Applied here, the court held that the fact that Sister Ephrem "may have been required by her vows to 'hand over' those rights does not mean that she actually did so," and thus "the Plaintiffs will have to demonstrate [to a jury] that a legally recognizable transfer of those rights occurred." *Id.*; *compare* Holy See Br. 47-48 (Church's view of the vow of poverty), *with* Doc. 95 at 40-43 (Fuller's view of the vow of poverty). Allowing the jury to decide the scope of the vow of poverty—which cannot be divorced from its theological underpinnings—will cause the same interference with Church governance and discipline as adjudicating Fuller's status within the Catholic Church. Both are precisely the type of significant, irrevocable harms that the collateral order doctrine is designed to prevent.

But not only did the district court impinge the dignity of a hierarchical church; it impinged the dignity of a foreign sovereign. *See* Holy See Br. 1. In particular, the court rejected as inconclusive a pronouncement from the Holy See, despite the fact that a Nota Verbale is indisputably the official position of a foreign sovereign. *See, e.g., United States v. Iribe*, 564 F.3d 1155, 1159 (9th Cir. 2009) ("The Department of State considers Diplomatic Note No. 46341 to be an official communication of the Government of Mexico."); *Iceland S.S. Co., Ltd.-Eimskip v. U.S. Dep't. of Army*, 201 F.3d 451, 458 (D.C. Cir. 2000) ("A diplomatic note is an official position of the type which is unlikely to be taken for litigation purposes, and is entitled to deference."). By issuing a Nota Verbale affirming the religious status of Fuller and requesting that "the United States of America and its courts accord full faith and credit to the Declaration," the Holy See asserted its sovereign interests in the proceeding. Doc. 317, ID 6823. These interests are protected by the collateral order doctrine. *Cf. O'Bryan v. Holy See*, 556 F.3d 361,

372 (6th Cir. 2009). The Holy See's status as a diplomatic sovereign makes the need for appellate intervention all the more urgent.

In addition to these dignitary harms, in assuming jurisdiction to review religious issues "secular authorities would necessarily intrude into church governance in a manner that would be inherently coercive, even if the alleged [issue] were purely nondoctrinal." *Tomic v. Catholic Diocese*, 442 F.3d 1036, 1039 (7th Cir. 2006), *abrogated on other grounds by Hosanna-Tabor*, 132 S. Ct. 694. The most obvious harm is the prospect of subjecting religious organizations to the crucible of discovery and/or trial. As the Supreme Court has explained, "it is not only the conclusions that may be reached by the [court] which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions." *NLRB*, 440 U.S. at 502; *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1171 (4th Cir. 1985) (warning that "church personnel and records would inevitably become subject to subpoena, discovery, cross-examination, the full panoply of legal process designed to probe the mind of the church"); *e.g.*, *Dayner v. Archdiocese of Hartford*, 23 A.3d 1192, 1199 (Conn. 2011) ("[T]he very act of litigating a dispute that is subject to the ministerial exception would result in the entanglement of the civil justice system with matters of religious policy, making the discovery and trial process itself a first amendment violation."); *see United States v. Morgan*, 313 U.S. 409, 421-22 (1941); *Fayerweather v. Ritch*, 195 U.S. 276, 306-07 (1904).

Once a church has been inappropriately subjected to these harms, subsequent correction through post-judgment review will not repair the damage. As in the immunity context, absent immediate review under the collateral order doctrine many of the "central benefits of [the First Amendment]—avoiding the costs and general consequences of subjecting [church] officials to the risks of discovery and trial—would be forfeited." *Puerto Rico Aqueduct*, 506 U.S. at 143-44;

*Forsyth*, 472 U.S. at 526; *see, e.g., United Methodist Church v. White*, 571 A.2d 790, 792 (D.C. 1990). Indeed, if religious organizations are forced to endure civil litigation in order to uphold the tenants of their faith, they might instead change their internal policies solely to avoid future litigation harassment. *See, e.g., EEOC v. Catholic Univ. of Am.*, 83 F.3d 455, 467 (D.C. Cir. 1996) ("Having once been deposed, interrogated, and haled into court, members of the Department of Canon Law and of the faculty review committees who are responsible for recommending candidates for tenure would do so with an eye to avoiding litigation or bureaucratic entanglement rather than upon the basis of their own personal and doctrinal assessments." (internal quotations omitted)). Immediate appellate review is necessary to ensure that churches are not put to this choice.

Similarly, it follows from the recognition that the First Amendment is in part an entitlement not to have a civil court resolve religious issues that a claim alleging protection under the Religious Clauses is "conceptually distinct" from the merits of the claims at issue. *Forsyth*, 472 U.S. at 527. In determining whether a civil court has authority over a religious issue, an appellate court need not consider the correctness of the facts. All it need determine is a question of law: whether the facts as alleged prohibit a civil court from resolving a religious issue. Of course, "the resolution of these legal issues will entail consideration of the factual allegations that make up the plaintiff's claim for relief," *id.* at 528, but the same is true for many claims that routinely qualify under the collateral order doctrine, *see id.* (listing cases).

Here, the district court's orders clearly turned on an issue of law: namely, that even taking the facts as alleged, a civil jury—and not the Church—must resolve these ecclesiastical issues. *See* Doc. 429, ID 8759 (refusing to take judicial notice of Fuller's status because "the Catholic Church is not a party to this case … [and so] the Court does not believe that the

Constitution is implicated by any ruling or finding in this case"); Doc. 326, ID 7073 (refusing to stay the proceedings because "[t]here is no possibility that anything that happens in this case will interfere with the Church's religious endeavors … [T]he Church is not a party to this suit, and thus will not be bound by any decision that may be made here with regard to the ownership of the Items."). The dispute involves the *authority* of the district court to resolve theological issues, which is separate from the merits. *See, e.g., White*, 571 A.2d at 792 ("In contending that the First Amendment protects the church from judicial inquiry into Rev. White's suit, UMC does not address the merits of the assertions in Rev. White's complaint against the church. Rather, UMC contests the authority of the civil courts to adjudicate a dispute between UMC and its pastor.").[2] And there is no question that the district court's orders "conclusively determined the disputed question." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 11-12 (1983); *see* Doc. 3 at 13-24, App. No. 12-2157. Thus, all the collateral order doctrine's requirements are met.

     At bottom, this Court has a duty to protect these important First Amendment interests. The district court's refusal to accept the Catholic Church's determination of Ms. Fuller's status, *see* App. No. 12-2257, and its refusal to stay the proceedings pending resolution of the ecclesiastical property issues by the Catholic Church and the subsequent and related denial of summary judgment, *see* App. No. 12-2157, are appealable under the collateral doctrine. This Court should find appellate jurisdiction and proceed to merits briefing.[3]

---

[2]    Unlike some other issues, *see, e.g., Mohawk*, 130 S. Ct. at 608-09, an immediate appeal of this type cannot "be made in virtually every case," *Digital Equipment*, 511 U.S. at 873. There is no fear, then, that granting immediate review here will "swallow the final judgment rule" or impose significant "institutional costs." *Mohawk*, 130 S. Ct. at 608-09. Quite the opposite, allowing review will ensure that federal courts will not attempt to resolve issues beyond their judicial authority. *See Serbian E. Orthodox*, 426 U.S. at 709.

[3]    In the event this Court remains concerned about appellate jurisdiction, however, it can defer resolution of the question until after merits briefing is completed and oral argument is held. *See, e.g., Lumpkin v. Envirodyne Indus.*, 933 F.2d 449, 454 n.3 (7th Cir. 1991).

## II. THE HOLY SEE'S BRIEF SUBSTANTIALLY SUPPORTS APPELLANTS' ARGUMENTS AND SHOULD BE FULLY DISCUSSED THROUGH MERITS BRIEFING.

In providing its views, the Holy See devoted 51 pages not to the issue of whether this appeal involves a category of claims falling within the ambit of the collateral order doctrine, but to whether Appellants should prevail on those claims. But resolution of those issues is premature. The collateral order doctrine inquiry is "conceptually distinct from the merits of the plaintiff's claim." *Iqbal*, 556 U.S. at 672; *see, e.g., United States v. Kashamu*, 656 F.3d 679, 681-82 (7th Cir. 2011). Just as whether an officer's ultimate entitlement to qualified immunity does not bear on the availability of immediate appeal of that question under the collateral order doctrine, whether Appellants are ultimately correct in asserting that the status and property issues in this case include ecclesiastical questions that cannot be subjected to a civil trial does not bear on the availability of appellate review here. Appellate review is available because, among other reasons, the category of claims at issue falls within the ambit of collateral order doctrine. *See supra* at 4-10. Nor is a response to an amicus brief the proper vehicle to fully address all of the issues raised by the Holy See—some of which have not been previously raised in this litigation. Nevertheless, aspects of the Holy See's discussion of the merits warrant a brief response.

With regard to Fuller's religious status, the Holy See was unequivocal: the district court erred as a matter of law in refusing to accept the Church's definitive resolution of this issue. "Because Fuller's status has been definitively resolved by the Church hierarchical authority, the issue should not be adjudicated by a jury." Holy See Br. 26. "This [was] not, in short, a case in which there is any ambiguity as to what the Church authorities have decided." *Id*. at 31. "To avoid interference in internal matters of ecclesiastical governance and discipline, the district court should [have] defer[red] to the decision of Church authorities regarding Fuller's status as a nun." *Id*. 30. Indeed, just last term the Supreme Court confirmed that "it is impermissible for the

government to contradict a church's determination of who can act as its ministers." *Hosanna-Tabor*, 132 S. Ct. at 704. The court simply had no authority to question this determination. *See id.* at 710 (Thomas, J., concurring) ("[T]he Religion Clauses require civil courts to apply the ministerial exception and to defer to a religious organization's good-faith understanding of who qualifies as its minister."); *id.* at 716 (Alito, J. and Kagan, J., concurring) ("What matters in the present case is that Hosanna-Tabor believes that [Ms. Perich qualifies as a minister] and the civil courts are in no position to second-guess that assessment.").[4]

Once the district court received Archbishop Tobin's declaration—and certainly after it received the Nota Verbale—it should have accepted the Church's resolution of the issue; the court had no authority to second-guess the Church's decision. *See, e.g., Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 179 (5th Cir. 2012) ("It is not for a court to say whom the Catholic Church may consider a … minister notwithstanding [the plaintiff's] attempts to impeach the church's own doctrine."); *Askew v. Trustees of Gen. Assembly of Church of the Lord Jesus Christ*, 684 F.3d 413, 415 (3d Cir. 2012) ("[T]he non-entanglement principle embedded in the Religion Clauses shields Bishop Shelton's membership decisions from civil court review. Correctly applying this principle, the District Court deferred to Bishop Shelton's declaration that

---

[4]     Although the Holy See expressed concern as to whether Appellants' requests for judicial notice were proper, *see* Holy See Br. 37-38, these issues were properly available for judicial notice. Federal Rule of Evidence 201(b)(2) provides that a court may take judicial notice of any fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Given that the court cannot second-guess a church's determination on this issue, *see* Holy See Br. 26-35, and there is no question that the Nota Verbale represented the official views of the Holy See, *see id*. 9-10, there is no doubt that the Church's determination on this issue "cannot readily be questioned." Moreover, federal courts are required to admit into evidence an official communication from the Holy See as a "foreign record" under Federal Rule of Evidence 902(12). In any event, any dispute as to the proper remedy for the district court's violation of the First Amendment with regard to Fuller's status should be addressed at the merits stage.

he terminated Askew's membership in the Church."). The court thus should reverse the district court and order it to take judicial notice of the Church's determination.[5]

With regard to the ecclesiastical property, the Holy See suggests that the appeal is moot because the Congregation has denied Mr. McCarthy's petition. Holy See Br. 38-39. Appellants, however, respectfully disagree. Mr. McCarthy has exercised his right to seek review of the denial of his petition under Church canonical norms and Divine Law, and the issue is therefore still properly before the Church. *See* Exhibit A. Moreover, Appellants' primary contention is that the district court has no authority to resolve these property issues because they involve religious issues beyond the judiciary's ken. That the Congregation may ultimately decline the opportunity to resolve these issues does not mean that a civil court is free to do so. When faced with a situation in which claims are inextricably intertwined with religious issues—and the hierarchical religious authority declines to resolve them—the proper outcome is for the court to dismiss the claims, rather than attempt to resolve the issue itself. *See, e.g., Klagsbrun v. Va'ad Harabonim*, 53 F. Supp. 2d 732, 742 (D.N.J. 1999) ("Because the plaintiffs' defamation claims raise inherently religious issues, neutral principles cannot be applied to resolve these claims. They are therefore not properly cognizable in this court, and the plaintiffs' action will be dismissed for lack of subject matter jurisdiction."). At a minimum, then, immediate appellate review is needed to ensure that the district court does not conduct a trial on the meaning of the vow of poverty— irrespective of whether a stay or dismissal of Fuller's property claims is ultimately deemed the appropriate remedy.

---

[5]      At this stage of the appeal—after the *Holy See itself* has weighed in on the issue at the Court's urging—there can be no question regarding Fuller's religious status within the Catholic Church. Under these circumstances, this Court is well within its rights to immediately inform the district court that this issue cannot be put before a jury.

The Holy See nevertheless suggests ways in which the district court could conduct a trial on the property claims that would "not necessarily" require engaging in inappropriate review of ecclesiastical issues. Holy See Br. 39-50. With respect, however, those arguments are misplaced for both factual and legal reasons that can be fully addressed in merits briefing. For example, the Holy See claims that Appellants lack *jus tertii* standing to assert property rights on behalf of the Church. But Appellees never raised this argument below and so it is waived. *See Hottenroth v. Vill. of Slinger*, 388 F.3d 1015, 1033 (7th Cir. 2004). And even if that issue had been raised, the argument is inapplicable for both First Amendment and other reasons. *See, e.g., Giddings v. Vision House Prod., Inc.*, 584 F. Supp. 2d 1222, 1226-29 (D. Ariz. 2008) ("If a claimant does not own a copyright, the claimant does not have standing to sue for infringement of the exclusive rights belonging to the owner."). The Holy See also suggests that these issues can be resolved through "neutral principles of law." Holy See Br. 46-50. But whether that doctrine remains viable in light of *Hosanna-Tabor*, and whether it could be invoked here, are merits issues that need to be resolved. *See DeBruin v. St. Patrick Congregation*, 816 N.W.2d 878, 888 n.8 (Wis. 2012) ("*Hosanna-Tabor* reaffirmed that the 'neutral principles' language from *Jones* applies to the 'regulation of only outward physical acts,' not to 'government interference with an internal church decision that affects the faith and mission of the church itself."); *see also Erdman v. Chapel Hill Presbyterian Church*, 286 P.3d 357, 368 (Wash. 2012). In short, the district court's orders regarding the ecclesiastical property are not moot, are not sustainable on the Holy See's alternative grounds, and therefore should be reversed.

## CONCLUSION

For the foregoing reasons, this Court should determine that it has appellate jurisdiction over Appellants' appeals, order the parties to brief the issues on the merits, and then reverse the district court.

Respectfully submitted,

/s/ William S. Consovoy

Michael A. Swift                          William S. Consovoy*
MAGINOT MOORE & BECK, LLP                  J. Michael Connolly
111 Monument Circle, Suite 3250            WILEY REIN LLP
Indianapolis, IN 46204                     1776 K Street NW
Tel: (317) 638-2922                        Washington D.C. 20006
maswift@maginot.com                        Tel:  (202) 719-7460
                                           Fax: (202) 719-7049
Bradley M. Stohry                          WConsovoy@wileyrein.com
REICHEL IP LLP
212 West 10th Street, Suite D-280
Indianapolis, IN 46202
(317) 423-8820
brad@reichelip.com


February 8, 2013                           *Counsel of Record for Appellants

16

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 8, 2013, I electronically filed the original of the foregoing document with the Clerk of this Court by using the CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

Dated: February 8, 2013               <u>/s/ William S. Consovoy</u>
                                      WILLIAM S. CONSOVOY